Slip Op. 18-7

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **NUCOR CORPORATION,** | |
| **Plaintiff,** | |
| **and** | |
| **ARCELORMITTAL USA LLC ET AL.,** | |
| **Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | |
| **UNITED STATES,** | **Court No. 16-00164** |
| **Defendant,** | **PUBLIC VERSION** |
| **and** | |
| **DONGKUK STEEL MILL CO., LTD. ET AL.,** | |
| **Defendant-Intervenors.** | |

### OPINION

[Sustaining the U.S. Department of Commerce's final determination in the investigation of certain corrosion-resistant steel products from the Republic of Korea.]

Dated: February 6, 2018

Timothy C. Brightbill, Wiley Rein, LLP, of Washington, DC, argued for plaintiff Nucor Corporation.  With him on the brief were Alan Hayden Price, Tessa Victoria Capeloto, and Adam Milan Teslik.

Melissa Marie Brewer, Kelley Drye & Warren, LLP, of Washington, DC, for plaintiff-intervenor ArcelorMittal USA LLC.

Stephen Andrew Jones and Daniel Lawrence Schneiderman, King & Spalding, LLP, of Washington, DC, for plaintiff-intervenor AK Steel Corporation.

Jeffrey David Gerrish, Skadden Arps Slate Meagher & Flom, LLP, of Washington, DC, for plaintiff-intervenor United States Steel Corporation.

Loren Misha Preheim, Assistant Director, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, of Washington, DC, argued for defendant.  On the brief were Elizabeth Anne Speck, Senior Trial Counsel, Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Catherine Dong Soon Miller, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement & Compliance, of Washington, DC.

Brady Warfield Mills, Morris, Manning & Martin, LLP, of Washington, DC, argued, for defendant-intervenors Dongkuk Steel Mill Co., Ltd., Union Steel Manufacturing Co. Ltd., and the Government of Korea.  With him on the brief were Donald Bertrand Cameron, Julie Clark Mendoza, Rudi Will Planert, Mary Shannon Hodgins, Eugene Degnan, Sarah Suzanne Sprinkle, and Henry Nelson La Salle Smith.

Kelly, Judge:   This action is before the court on a United States Court of International Trade Rule 56.2 motion for judgment on the agency record challenging certain aspects of the U.S. Department of Commerce's ("Department" or "Commerce") final determination in the countervailing duty ("CVD") investigation of certain corrosion-resistant steel ("CORE") products from the Republic of Korea ("Korea"), which resulted in a CVD order.  See Pl. Nucor Corp. & Pl.-Intervenors ArcelorMittal USA LLC, AK Steel Corp., & United States Steel Corp. Rule 56.2 Mot. J. Agency R. at 1, Feb. 16, 2017, ECF No. 57 ("Pl. & Pl.-Intervenors' Mot."); see also [CVD] Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) (final affirmative determination, and final affirmative critical circumstances determination, in part) ("Final Results"), and accompanying Issues and Decision Memorandum for the Final Determination in the [CVD] Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea, C-580-879, (May 24,

2016), ECF No. 31-5 ("Final Decision Memo"); <u>see also</u> <u>Certain Corrosion-Resistant Steel</u>

<u>Products From India, Italy, Republic of Korea and the People's Republic of China</u>, 81 Fed.

Reg. 48,387 (Dep't Commerce July 25, 2016) ([CVD] order).  Plaintiff, Nucor Corporation

("Nucor" or "Plaintiff"), commenced this action pursuant to section 516A of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1516a (2012).[1]  <u>See</u> Summons, Aug. 24, 2016, ECF

No. 1; Compl. at ¶¶ 2, 14–21, Sept. 8, 2016, ECF No. 8.  Plaintiff-Intervenors ArcelorMittal

USA LLC, AK Steel Corporation, and United States Steel Corporation (collectively

"Plaintiff-Intervenors") join in Plaintiff's motion for judgment on the agency record.  <u>See</u>

Pl. & Pl.-Intervenors' Mot. at 1.  Nucor and Plaintiff-Intervenors challenge as contrary to

law, arbitrary and capricious, and unsupported by substantial evidence Commerce's

determinations: (1) that the Government of Korea's ("GOK") price-setting method or

standard pricing mechanism for electricity did not confer a benefit; and (2) not to apply an

adverse inference that state intervention by the GOK results in electricity prices that are

inconsistent with market principles.[2]  <u>See</u> Mem. Pl. Nucor Corp. & Pl.-Intervenors

ArcelorMittal USA LLC, AK Steel Corp., & United States Steel Corp. Supp. Mot. J. Agency

R. at 2–3, Feb. 17, 2017, ECF No. 60 ("Pl. & Pl.-Intervenors' Br."); Pl. & Pl.-Intervenors'

Mot at 2.  Further, in the event the court concludes that Commerce's determination is

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[2] Although 19 U.S.C. § 1677e(a)–(b) and 19 C.F.R. § 351.308(a)–(c) (2014) each separately provide for the use of facts otherwise available and the subsequent application of adverse inferences to those facts, Commerce uses the shorthand "adverse facts available" or "AFA" to refer to its use of such facts otherwise available with an adverse inference.  <u>See, e.g.</u>, Final Decision Memo at 12.

contrary to law, arbitrary and capricious, or unsupported by substantial evidence, Nucor and Plaintiff-Intervenors request that the court remand this action for Commerce to consider whether the provision of electricity for less than adequate remuneration ("LTAR") provides a specific benefit to the CORE industry in Korea.  See Pl. & Pl.-Intervenors' Br. at 3, 39; see also Pl. & Pl.-Intervenors' Mot. at 2.[3]

The court sustains Commerce's determinations that the GOK's standard pricing mechanism for electricity does not confer a benefit and that an adverse inference is not warranted concerning government intervention in electricity pricing.  Accordingly, the court denies Plaintiff's request for a remand and need not reach the issue of whether the GOK's standard pricing mechanism provides a specific benefit.

## BACKGROUND

On June 23, 2015, Commerce initiated a CVD investigation of certain corrosion-resistant steel products from Korea.  See Certain Corrosion-Resistant Steel Products

---

[3] On November 6, 2017, Defendant filed on the docket, as supplemental authority, the recent decision in Maverick Tube Corp. v. United States, 41 CIT __, Slip Op. 17-146 (October 27, 2017). Def.'s Notice of Recent Ct. Op. at 3, Nov. 6, 2017, ECF No. 83.  Plaintiff Nucor Corporation filed a Motion for Leave to Respond to Defendant's Notice of Supplemental Authority, Nov. 29, 2017, ECF No. 84 ("Nucor's Motion"), to which it attached Petitioners' Response to Defendant's Notice of Supplemental Authority, Nov. 29, 2017, ECF No. 84 ("Pl. & Pl.-Intervenors' Resp. Suppl. Auth.").  Defendant and Defendant-Intervenors, individually, submitted responses to Nucor's Motion.  Def.'s Resp. Pl.'s Request Leave File Resp. to Def.'s Notice Recent Ct. Op., Dec. 1, 2017, ECF No. 85; Def.-Intervenors' Mot. Leave Reply Pl.'s Resp. to Def.'s Notice Recent Ct. Op., Dec. 1, 2017, ECF No. 86.  The court granted Nucor's Motion and allowed Defendant and Defendant-Intervenors to file substantive briefs addressing the arguments raised in Plaintiff and Plaintiff-Intervenors' response to the Maverick court's opinion.  See Order, Dec. 1, 2017, ECF No. 87; see also Pl. & Pl.-Intervenors' Resp. Suppl. Auth.; Maverick, 41 CIT __, Slip Op. 17-146.  Such responses were filed.  See Def.-Intervenors' Reply Pl.'s Resp. to Def.'s Notice Recent Ct. Op., Dec. 18, 2017, ECF No. 89; Def.'s Reply Pls.' Resp. to Def.'s Notice Recent Ct. Op., Dec. 19, 2017, ECF No. 90.

From the People's Republic of China, India, Italy, the Republic of Korea, and Taiwan, 80

Fed. Reg. 37,223 (Dep't Commerce June 30, 2015) (initiation of CVD investigations).

Commerce selected Union Steel Manufacturing Co. Ltd./Dongkuk Steel Mill Co., Ltd.

("Union") and Dongbu Steel Co., Ltd./Dongbu Incheon Steel Co., Ltd. (collectively

"Dongbu") as mandatory respondents.   Final Decision Memo at 2; see Decision

Memorandum for the Preliminary Affirmative Determination: [CVD] Investigation of

Certain Corrosion-Resistant Steel Products from the Republic of Korea at 2, C-580-879,

PD 413, bar code 3413232-01 (Nov. 2, 2015) ("Prelim. Decision Memo")[4] (citing

Respondent Selection Memo, PD 79, bar code 3293311-01 (July 23, 2015) ("Resp't

Selection Mem."));[5] see also Resp't Selection Mem. at 4, 6–7, 9–10; Section 777A(e)(2)

---

[4] There is an insignificant discrepancy in the names of the mandatory respondents identified in the preliminary determination and the final determination.  Compare Prelim. Decision Memo at 2 with Final Decision Memo at 2.  In the preliminary determination, the Department identifies Union Steel Manufacturing Co. Ltd. and Dongbu Steel Co., Ltd. as the mandatory respondents, see Prelim. Decision Memo at 2 (citation omitted), but notes that Dongkuk Steel Mill Co., Ltd. is Union Steel Manufacturing Co. Ltd.'s former parent company and successor-in-interest after a 2015 merger, id., and that Dongbu Incheon is a wholly owned subsidiary of Dongbu Steel Co., Ltd. Id. at 8.  In the final determination, the Department more clearly indicates the relationships between these entities by identifying the mandatory respondents as "Union Steel Manufacturing Co. Ltd./Dongkuk Steel Mill Co., Ltd." and "Dongbu Steel Co., Ltd./Dongbu Incheon Steel Co., Ltd." See Final Decision Memo at 2; see also [CVD] Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea, 81 Fed. Reg. 35,310, 35,311 n.6 (Dep't Commerce June 2, 2016) (final affirmative determination, and final affirmative critical circumstances determination, in part) (citation omitted).

[5] On October 18, 2016, Defendant submitted indices to the public and confidential administrative records for this CVD investigation, which identify the documents that comprise the records to Commerce's final determination.  These indices are located on the docket at ECF Nos. 31-2 and 31-3, respectively.  See Administrative Record Index, Oct. 18, 2016, ECF No. 31-2–3.  All further references to the documents from the administrative record are identified by the numbers assigned by Commerce in these indices.

of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677f-1(e)(2); 19 C.F.R. §351.204(c)(2)

(2015).[6]

 In its petition, Nucor alleged that the GOK, through the Korea Electric and Power

Corporation ("KEPCO"), a state-owned electricity provider, provides CORE producers

with electricity for LTAR.[7]  <u>See</u> Pl. & Pl.-Intervenors' Br. at 4 (citing Petitioners' Petition

Part 3 at 4–15, PD 4, bar code 3280986-03 (June 3, 2015)); <u>see also</u> Petitioners' Petition

Parts 4–5, PD 2–3, bar codes 3280986-04–05 (June 3, 2015); Petitioners' Petition Parts

6–16, PD 6–14, bar codes 3280986-06–14 (June 3, 2015) (reproducing excerpts from

petitioners' petitions to Commerce and the International Trade Commission alleging

material injury to the domestic industry)).  To evaluate the adequacy of remuneration for

the provision of electricity by KEPCO, Commerce preliminarily determined that a tier three

benchmark[8] (i.e., consistent with market principles) was appropriate because neither a

tier one benchmark (i.e., in-country market determined price) nor a tier two benchmark

---

[6] Further citations to Title 19 of the Code of Federal Regulations are to the 2015 edition.

[7] Commerce found that "KEPCO is an integrated electric utility company engaged in the transmission and distribution of substantially all of the electricity in Korea."  Prelim. Decision Memo at 18 (citations omitted).  Commerce also preliminarily found that the GOK is an "authority" for purposes of 19 U.S.C. § 1677(5)(B) which provides a good or service through its ownership interest in KEPCO, and by the GOK's regulation and approval of electricity tariffs charged by KEPCO.  <u>See</u> <u>id.</u> at 18–19; <u>see also</u> 19 U.S.C. § 1677(5)(B).

[8] Under 19 CFR § 351.511(a)(2), the Department determines whether electricity is provided for LTAR by comparing, in order of preference: (i) the government price to a market determined price for actual transactions within the country such as electricity tariffs from private parties (referred to as a tier one benchmark); (ii) the government price to a world market price where it would be reasonable to conclude that such a world market price is available to electricity consumers in the country in question (referred to as a tier two benchmark); or (iii) if no world market price is available then the Department will measure the adequacy of remuneration by assessing whether the government price is consistent with market principles (referred to as a tier three benchmark).

(i.e., world market price) were available.  <u>See</u> Prelim. Decision Memo at 19–20; <u>see also</u> 19 C.F.R § 351.511(a)(2)(i)–(iii) (providing how Commerce will measure the adequacy of remuneration).   To determine whether KEPCO's prices were set in accordance with market principles, Commerce analyzed KEPCO's price-setting method.  Prelim. Decision Memo at 21.   Commerce preliminarily found that KEPCO's price-setting method was consistent with market principles because the electricity tariff schedules in effect during the period of investigation ("POI") were

> calculated by (1) distributing the overall cost according to the stages of providing electricity (generation, transmission, distribution, and sales); (2) dividing each cost into a fixed cost, variable cost, and the consumer management fee; and (3) then calculating the cost by applying the electricity load level, peak level, and the patterns of consuming electricity.  Each cost was then distributed into the fixed charge and the variable charge.  KEPCO then divided each cost taking into consideration the electricity load level, the usage pattern of electricity, and the volume of the electricity consumed. Costs were then distributed according to the number of consumers of each classification of electricity.

Prelim. Decision Memo at 21 (citing Questionnaire for the [GOK], Section II at 13–14, CD 110, bar code 3304996-02 (Sept. 14, 2015) ("GOK Questionnaire Section II"); 2nd Suppl. Questionnaire for the [GOK] at 6–9, CD 498, bar code 3406269-02 (Oct. 15, 2015) ("GOK Second Suppl. Questionnaire")).   Commerce preliminarily determined that KEPCO applied the same price-setting mechanism throughout the POI, and that the prices charged to the respondents pursuant to the tariff schedule applicable to industry users, "were consistent with KEPCO's standard pricing mechanism."  <u>Id.</u> at 22.   Accordingly, Commerce concluded that KEPCO's electricity program did not constitute LTAR so did not confer a benefit and, thus, could not be considered a countervailable subsidy.  <u>See</u> <u>id.</u>

Commerce preliminarily assigned Dongbu a CVD cash deposit rate of 1.37 percent and did not assign Union a CVD cash deposit rate, as only a de minimis rate had been calculated for that respondent.  See [CVD] Investigation of Certain Corrosion-Resistant Steel Products From Korea, 80 Fed. Reg. 68,842 (Dep't Commerce Nov. 6, 2015) (preliminary affirmative determination); see also 19 C.F.R. § 351.205(d) (providing instructions for assignment of cash deposits); 19 U.S.C. § 1671b(b)(4)(A) (providing that the agency "shall disregard any de minimis countervailable subsidy").   Additionally, Commerce preliminarily assigned Dongbu's rate as the "all-others" rate because it was the only calculated non-de minimis rate.  Id.; see also 19 U.S.C. § 1671d(c)(5)(A)(i) (providing that the all-others rate may not include zero and de minimis countervailable subsidy rates, or rates based entirely on facts otherwise available pursuant to 19 U.S.C. § 1677e).  Commerce subsequently verified the data submitted by the GOK and the respondents.  See Final Decision Memo at 2 (citations omitted).

In its final determination, Commerce continued to find that KEPCO did not provide electricity to CORE manufacturers in Korea for LTAR.  See Final Decision Memo at 18–19, 23; Prelim. Decision Memo at 19, 21–22.  Commerce also further analyzed the standard pricing mechanism based upon information placed on the record by the GOK, and determined that KEPCO covered its costs for the industry tariff in effect during the POI.  See Final Decision Memo at 23.  Commerce also declined to apply adverse facts available ("AFA") to conclude that the GOK's provision of electricity does not conform to market principles.  See id. at 12.

As a result of changes not at issue here between Commerce's preliminary and final determinations, Commerce calculated a CVD rate for Dongbu of 1.19 percent and continued to calculate a de minimis CVD rate for Union.  Final Results, 81 Fed. Reg. at 35,311–12.  Commerce altered the all others rate accordingly to 1.19 percent.  See id.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an investigation of a CVD order.  See 19 U.S.C. § 1516a(a)(2)(B)(i); 28 U.S.C. § 1581(c).  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.  Commerce's Determination that the Korean Government Does Not Provide Electricity for LTAR

Nucor and Plaintiff-Intervenors assert three challenges to Commerce's determination that the GOK's provision of electricity did not provide a benefit to CORE manufacturers.  See Pl. & Pl.-Intervenors' Br. at 2–3.  First, they argue that Commerce's analysis of whether KEPCO's standard pricing mechanism measures the adequacy of remuneration is contrary to law because it fails to give effect to the adequacy of remuneration standard contained in the statute.  See id. at 15–24.  Second, they claim that Commerce's determination is arbitrary and capricious because Commerce's explanation fails to articulate a rational connection between its findings and the record evidence, and fails to consider the most important aspects of the problem identified by

petitioners below.[9]  See Pl. & Pl.-Intervenors' Br. at 24–29.  Third, they contend that

Commerce's determination that KEPCO's electricity prices are consistent with market

principles is unsupported by substantial evidence.  See id. at 29–34.  The court addresses

each challenge in turn.

### A. Commerce's Methodology

Nucor and Plaintiff-Intervenors argue that Commerce's methodology for

determining the adequacy of remuneration is contrary to law.  See Pl. & Pl.-Intervenors'

Br. at 15–24.  Defendant responds that Commerce applied the tier three benchmark to

measure the adequacy of remuneration, as dictated by 19 C.F.R. § 351.511(a)(2)(iii),

which incorporates an evaluation of the government's price-setting philosophy as a factor

to be considered in assessing whether a government price is consistent with market

principles.  See Def.'s Resp. Pls.' Mot. J. Upon Agency R. at 20–23, June 5, 2017, ECF

No. 63 ("Def.'s Resp. Br.").

For a subsidy to be countervailable, Commerce must determine that an authority

provides a subsidy that is specific and constitutes a financial contribution, by which a

benefit is conferred.  See 19 U.S.C. § 1677(5), (5A).  Pursuant to the statute, an authority

is "a government of a country or any public entity within the territory of the country."  19

U.S.C. § 1677(5)(B).  A financial contribution includes, among other things, "providing

goods or services, other than general infrastructure[.]"  19 U.S.C. § 1677(5)(D)(iii).

---

[9] The petitioners below were United States Steel Corporation, Nucor Corporation, Steel Dynamics, Inc., ArcelorMittal USA, LLC, AK Steel Corporation, and California Steel Industries. Prelim. Decision Memo at 1.

Relevant here, a benefit is conferred "where goods or services are provided, if such goods or services are provided for less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv).

Commerce has discretion to establish what constitutes "adequate remuneration" for the purpose of determining whether a benefit was conferred to the recipient of a subsidy. The statute does not define the phrase "adequate remuneration," nor does it provide a methodology for measuring the adequacy of remuneration. Congress granted Commerce considerable discretion to construct a methodology "to identify and measure the benefit of a subsidy." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 927 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4241 ("SAA"). Furthermore, the court affords Commerce significant deference in "[a]ntidumping and [CVD] determinations involv[ing] complex economic and accounting decisions of a technical nature[.]" Fujitsu General Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citation omitted). However, despite Commerce's wide discretion, the Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983) (citations omitted). To be afforded deference, Commerce's methodological approach must be a "reasonable means of effectuating the statutory purpose" and its conclusions must be supported by substantial evidence. Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986) (citations omitted), aff'd, 810 F.2d 1137, 1138–39 (Fed. Cir. 1987).

Commerce's regulations provide that the agency shall measure the adequacy of remuneration by comparing the government price to a multi-tiered series of benchmark prices.  See 19 C.F.R. § 351.511(a)(2)(i)–(iii).  Generally, Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question,"  (i.e., a tier one benchmark).  19 C.F.R. § 351.511(a)(2)(i).  In the absence of a "useable market-determined price with which to make the [tier one] comparison," Commerce will "compar[e] the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." (i.e., a tier two benchmark).  19 C.F.R. § 351.511(a)(2)(ii).  In the absence of both an in-country market-determined price and an available world market price, Commerce "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles," (i.e., a tier three benchmark).  19 C.F.R. § 351.511(a)(2)(iii).  The regulation does not define the term "market principles."  However, Commerce has, in its discretion, provided a methodology for determining whether a government price is set in accordance with market principles.  See Countervailing Duties, 63 Fed. Reg. 65,348, 65,377–79 (Dep't Commerce Nov. 25, 1998) (final rule) ("CVD Preamble").[10]  Where a tier three benchmark is used,

---

[10] The CVD Preamble explains the purpose of the CVD regulations that Commerce promulgated to conform to the Uruguay Round Agreements Act.  See CVD Preamble, 63 Fed. Reg. at 65,348.  One of these regulations is 19 C.F.R. § 351.511(a)(2), which addresses Commerce's methodology for analyzing whether a good or service is provided for LTAR.  See 19 C.F.R. § 351.511(a)(2).

Commerce's practice is to "assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination."[11]  Id., 63 Fed. Reg. at 65,378.  However, Commerce does not prioritize any one factor and "may rely on one or more of these factors in any particular case."  Id.

Here, Commerce chose to examine the government's price-setting philosophy by looking at whether KEPCO had a standard pricing mechanism and whether the prices it charged were consistent with that mechanism.  Final Decision Memo at 18–23.  The court cannot say that Commerce's reliance on a price-setting mechanism, which is a government price-setting philosophy, is unreasonable.  As recently explained in Maverick Tube Corp. v. United States,

> the statute directs Commerce to determine if a benefit is present by determining whether a good or service is provided "for less than adequate remuneration." Adequate remuneration is to be measured by "prevailing market conditions . . . in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E). The statute does not direct Commerce to create a fictional model market . . . . The statute directs Commerce to judge the adequacy of remuneration based on market conditions that actually exist in Korea. That the Korean electricity market is controlled by a state run monopoly does not change the statute.

Maverick Tube Corp. v. United States, 41 CIT __, __, Slip Op. 17-146 at 20–21 (October 27, 2017).  The court agrees with the analysis in Maverick.

---

[11] Nucor and Plaintiff-Intervenors do not challenge Commerce's decision to apply a tier three benchmark analysis to determine whether the provision of electricity was for adequate remuneration.

Nucor and Plaintiff-Intervenors argue that Commerce's approach contradicts the statutory framework.  <u>See</u> Petitioners' Response to Defendant's Notice of Supplemental Authority at 8–9, Nov. 29, 2017, ECF No. 84 ("Pl. & Pl.-Intervenors' Resp. Suppl. Auth."); <u>see also</u> 19 U.S.C. § 1677(5)(E); 19 C.F.R. § 351.511.  Nucor and Plaintiff-Intervenors argue that Commerce fails to give "identical words and phrases within the same statute" the same meaning, because adequate remuneration is measured differently within the subsections of the regulation.  Pl. & Pl.-Intervenors' Resp. Suppl. Auth. at 6 (quoting <u>FCC v. AT&T Inc.</u>, 562 U.S. 397, 408 (2011)); <u>see also</u> 19 C.F.R. § 351.511(a)(2)(i)–(iii).  Commerce has not given identical words different meanings here.  The phrase "adequate remuneration" is capacious enough to be viewed as a standard to be applied to given contexts.  In a tier three benchmark analysis, Commerce specifically looks at market principles to assess adequate remuneration.  19 C.F.R. § 351.511(a)(2)(iii).

Nucor and Plaintiff-Intervenors also argue that Commerce may not, in evaluating whether the government price provides "adequate remuneration," rely on a market where government control is "so pervasive and complete that 'market principles' have ceased to exist entirely."  Pl. & Pl.-Intervenors' Resp. Suppl. Auth. at 9.  In 19 C.F.R. § 351.511. Commerce created a hierarchal approach to implement the "adequate remuneration" standard.  <u>See</u> <u>CVD Preamble</u>, 63 Fed. Reg. at 65,377–78; 19 C.F.R. § 351.511.  In doing so, Commerce recognized "what constitutes adequate remuneration depends on the nature of the marketplace, and where the marketplace is a government-controlled monopoly, there is a role for a preferentiality based test."  <u>See</u> <u>Maverick</u>, 41 CIT at __,

Slip Op. 17-146 at 16; id. at 19–21; see also CVD Preamble, 63 Fed. Reg. at 65,378.[12]

Given the statutory and regulatory language, Commerce's interpretation is reasonable.

The statute sets a standard of adequate remuneration, 19 U.S.C. § 1677(5)(E), and the

regulation explicates that standard in a variety of contexts.  19 C.F.R § 351.511(a)(2)(i)–

(iii).  Under the tier one benchmark analysis, Commerce is specifically asked to compare

the "government price" to a price resulting from actual in-country transactions.  19 C.F.R.

§ 351.511(a)(2)(i).   In the tier two benchmark analysis, Commerce compares the

"government price" to a world market price, "where it is reasonable to conclude that such

price would be available to" in-country purchasers.   19 C.F.R. § 351.511(a)(2)(ii).   In

comparison, the tier three benchmark analysis specifically directs Commerce to

---

[12] Nucor and Plaintiff-Intervenors challenge the Maverick court's statement that "under the tier three benchmark analysis Commerce takes the market as it finds it, even if it is, for all practical purposes, a monopoly."  Pl. & Pl.-Intervenors' Resp. Suppl. Auth. at 6 (quoting Maverick, 41 CIT at __, Slip Op. 17-146 at 23); id. at 8–9.  They argue that Commerce has never taken the market as it found it, "[r]ather, it measures the adequacy of remuneration by comparing the price paid by a particular respondent to an adjusted benchmark figure representative of the market price for the good at issue."  Pl. & Pl.-Intervenors' Resp. Suppl. Auth. at 8 (citing Beijing Tianhai Indus. Co. v. United States, 39 CIT __, 52 F. Supp. 3d 1351, 1365 (2015); see also Pl. & Pl.-Intervenors' Resp. Suppl. Auth. at 8–9 (citing Issues and Decision Memorandum for the Final Determination in the [CVD] Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea    at    31,    C-580-888,    (Mar.    29,    2017),    available    at https://enforcement.trade.gov/frn/summary/korea-south/2017-06632-1.pdf (last visited Feb. 1, 2018) ("Certain Carbon & Alloy Steel")); SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (finding that where the same phrase is used in various sections of the statute, the agency cannot give it different meanings, especially when the phrase is directed at the same calculation).  The authority cited for the proposition put forth by Nucor or Plaintiff-Intervenors are either inapposite or unhelpful.  See Beijing Tianhai, 52 F. Supp. 3d at 1365 (averaging benchmark prices for three other countries under a tier two benchmark analysis); Certain Carbon & Alloy Steel at 31 (explaining that "the Department clarified [in the CVD Preamble] that a price discrimination analysis may still be appropriate under the new law [i.e., LTAR standard] because, in the context of a tier three benchmark analysis, 'there may be instances where government prices are the most reasonable surrogate for market-determined prices.'"); SKF, 263 F.3d at 1382 (discussing the meaning of foreign like product).

determine "whether the government price is consistent with market principles." 19 C.F.R.

§ 351.511(a)(2)(iii).  Commerce only resorts to the tier three benchmark analysis when

market prices outside of the government-controlled market are not available.  Therefore,

the very existence of the tier three benchmark analysis supports the view that the relevant

market principles are those operating within the government-controlled market.[13]

Nucor and Plaintiff-Intervenors argue that Commerce's use of the standard pricing

mechanism is contrary to law because it reflects the earlier preferentiality standard and

fails to give effect to the current LTAR standard.[14]  Pl. & Pl.-Intervenors' Br. at 17–22; Pl.

---

[13] Nucor and Plaintiff-Intervenors' invocation of Laminated Woven Sacks IDM is also unavailing. See Pl. & Pl. Intervenors' Resp. Suppl. Auth. at 13; see generally Issues and Decision Memorandum for the Final Affirmative [CVD] Determination: Laminated Woven Sacks from the [PRC] at 15–16, C-570-917, (June 16, 2008), available at http://ia.ita.doc.gov/frn/summary/prc/E8-14256-1.pdf (last visited Feb. 1, 2018) ("Laminated Woven Sacks IDM").  In Laminated Woven Sacks IDM, under a tier three benchmark analysis, Commerce found that "the purchase of land-use rights in China is not conducted in accordance with market principles" because of "widespread and documented deviation from the authorized methods of pricing and allocating land." Id. at 16.  The other determinations cited by Nucor and Plaintiff-Intervenors are distinguishable for the same reason.  See Pl. & Pl.-Intervenors' Resp. Suppl. Auth. at 12–13; see generally Issues and Decision Memorandum for the Final Determination in the [CVD] Investigation of Citric Acid and Certain Citrate Salts from the People's Republic of China [("PRC")] at 23–24, 96, C-570-938, (Apr. 6, 2009), available at http://ia.ita.doc.gov/frn/summary/prc/E9-8358-1.pdf (last visited Feb. 1, 2018) (finding, under a tier three benchmark analysis, that the prices in the land-use rights market are not set "in accordance with market principles," as previously determined in Laminated Woven Sacks IDM); [CVD] of Certain Uncoated Paper from Indonesia: Issues and Decision Memorandum for the Final Affirmative Determination at 13–16, 31–32, C-560-829 (Jan. 8, 2016), available at https://enforcement.trade.gov/frn/summary/indonesia/2016-01026-1.pdf (last visited Feb. 1, 2018) (finding, under a tier three benchmark analysis, that prices were not set in accordance with the market principles operating in the given home market).

[14] Nucor and Plaintiff-Intervenors note that Commerce described the preferentiality standard as "a measure of price discrimination, i.e., whether a government is favoring some buyers over others with lower prices," and not a measure of adequate remuneration.  Pl. & Pl-Intervenors' Br. at 19 (emphasis omitted) (quoting Certain Softwood Lumber Products from Canada, 66 Fed. Reg.

(footnote continued)

& Pl.-Intervenors' Resp. Suppl. Auth. at 2–10.  However, Nucor and Plaintiff-Intervenors'

argument ignores the language of the <u>CVD Preamble</u>, which explains the continuing role

of the preferentiality analysis in the LTAR standard.  <u>See</u> <u>CVD Preamble</u>, 63 Fed. Reg.

at 65,377–78.  Commerce promulgated 19 C.F.R. § 351.511 following the change from

the preferentiality standard to the LTAR standard and incorporated into the regulation, as

part of its tier three benchmark analysis, a consideration of factors such as the

government's price-setting philosophy, costs or possible price discrimination.[15]  <u>See</u> <u>CVD</u>

<u>Preamble</u> at 65,378; <u>see also</u> 19 C.F.R. § 351.511.  By including these factors in the tier

three benchmark analysis, Commerce relegated the preferentiality standard to situations

where neither an in-country market price, i.e., a tier one benchmark, nor a world market

---

43,186, 43,196 (Dep't Commerce Aug 17, 2001) (notice of preliminary affirmative CVD determination, preliminary affirmative critical circumstances determination, and alignment of final [CVD] determination with final antidumping duty determination)).  However, as explained in this opinion, Commerce is not prohibited from looking at preferentiality as part of its methodology under the current LTAR standard.

[15] Nucor and Plaintiff-Intervenors claim that Commerce erroneously relied on <u>Magnesium from Canada Final Results</u> as support for the standard pricing mechanism, as that determination preceded the codification of 19 C.F.R. § 351.511 and the shift from the preferentiality standard to the LTAR standard.  <u>See</u> Pl. & Pl.-Intervenors' Br. at 17–19 (citing <u>Pure Magnesium and Alloy Magnesium From Canada</u>, 57 Fed. Reg. 30,946 (Dept. Commerce July 13, 1992) (final affirmative [CVD] determinations) ("<u>Magnesium from Canada Final Results</u>")); <u>see also</u> 19 C.F.R. § 351.511(a)(2)(i)–(iii) (providing how Commerce will measure the adequacy of remuneration following the shift to the LTAR standard); 19 U.S.C. § 1677(5)(E)(iv) (directing Commerce to find that a benefit was conferred when a good or service is provided for LTAR); 19 U.S.C. § 1677(5)(A)(ii)(II) (1988) (providing the prior statutory framework defining a benefit as "[t]he provision of goods or services at preferential rates").  However, Commerce did not rely upon <u>Magnesium from Canada Final Results</u> to support the appropriateness of its methodology, but rather cited it as an example of a case where it might be appropriate to analyze whether the government provider applied a standard pricing mechanism.  <u>See</u> Final Decision Memo at 20.  Moreover, Commerce incorporated an evaluation of factors such as the government's price-setting philosophy into its tier three benchmark evaluation of whether government prices are set in accordance with market principles following the shift to the LTAR standard.  <u>See</u> <u>CVD Preamble</u>, 63 Fed. Reg. at 65,378.

price, i.e., a tier two benchmark, is available.  See CVD Preamble, 63 Fed. Reg. at 65,378.

Therefore, the tier three benchmark analysis preserves a place for the preferentiality test

in the absence of either an in-country or a world market price.  See Maverick, 41 CIT at

__, Slip Op. 17-146 at 16; see also CVD Preamble, 63 Fed. Reg. at 65,377–78; 19 C.F.R.

§ 351.511(a)(2)(iii).

Further, Nucor and Plaintiff-Intervenors argue that Commerce's methodology does

not meaningfully evaluate whether a benefit is conferred because it compares KEPCO's

electricity rates to themselves rather than to benchmark, market-determined electricity

rates.  See Pl. & Pl.-Intervenors' Br. at 20–21.  Therefore, they argue that Commerce's

methodology of evaluating whether KEPCO's prices are set in accordance with a

standard pricing mechanism is contrary to law because Commerce cannot reasonably

"base its benefit determination on a methodology that simply compares one market-

distorted price to another to determine whether mandatory respondents are receiving

disparate treatment."  Id. at 22.  However, as explained above, Nucor and Plaintiff-

Intervenors' argument is based on a misunderstanding of what may serve as a "market"

for the purpose of evaluating whether a government price is consistent with market

principles pursuant to 19 C.F.R. § 351.511(a)(2)(iii).  The relevant market principles can

be those operating within the government-controlled market.   Here, Commerce

determined that KEPCO is the relevant authority.   Prelim. Decision Memo at 18–19.

Therefore, Commerce evaluated the adequacy of remuneration by analyzing the extent

to which the price-setting methodology used by KEPCO provides a uniform pricing

mechanism for all users.[16]   See Final Decision Memo at 18–19.   It is reasonably

discernible that Commerce looked at the standard pricing mechanism as a proxy for

conformity with market principles by acknowledging that, under a tier three analysis, the

government prices may be the most reasonable surrogate for market principles.   See id.

at 21.[17]

Nucor and Plaintiff-Intervenors also argue that Commerce's methodology is

inconsistent with the statute because Commerce's analysis fails to consider whether a

seller covers its costs.   Pl. & Pl.-Intervenors' Br. at 22–24.   Consequently, they claim that

Commerce failed to incorporate cost recovery into its analysis of the adequacy of

remuneration for respondents' electricity costs.   See id. at 23.   However, a review of

Commerce's regulation makes clear that "adequate remuneration" is defined by reference

to the benchmark hierarchy.   See 19 C.F.R. § 351.511(a)(2)(i)–(iii).   Where Commerce

lacks an actual market-determined price and a world market price for the good in question,

the tier three benchmark analysis directs Commerce to measure the adequacy of

---

[16] Specifically, Commerce found that "[t]he GOK reported that a single tariff rate table applied [to the respondents] throughout the POI[.]"  Final Decision Memo at 18 (citations omitted).  Further, Commerce found that there was no information to undermine the GOK's statement that KEPCO applied the same price-setting method to determine electricity tariffs.  Id. at 18–19.

[17] In any event, Commerce did not base its determination that electricity was not provided to respondents for LTAR exclusively on the uniformity of KEPCO's standard pricing mechanism. Commerce also determined that the standard pricing mechanism KEPCO used to develop the tariff schedule applicable to sales of electricity to respondents was based on KEPCO's costs. Final Decision Memo at 23.  Commerce looked at cost recovery as a measure of KEPCO's ability of being adequately remunerated.  Id. at 21–23.  To analyze whether KEPCO's tariff schedule allowed KEPCO to recover its costs, Commerce analyzed the tariff schedule provided by KEPCO. Id. at 23.  Commerce outlined the specific means by which costs are taken into consideration in generating electricity tariffs for consumers, and found that KEPCO's tariff schedule incorporated costs.  Id.  Commerce then determined that, during the POI, KEPCO was able to recover its costs. Id.

remuneration by assessing whether the government price is consistent with market principles. <u>See</u> 19 C.F.R. § 351.511(a)(2)(iii).  Here, Commerce specifically determined that the relevant price for KEPCO's industrial tariff schedule is the price KEPCO pays for electricity through the Korea Power Exchange ("KPX"). <u>See</u> Final Decision Memo at 23. Commerce then explained how KEPCO is able to recover its costs. <u>Id.</u>  Commerce's methodology is in accordance with law.

### B. Commerce's LTAR Determination Is Not Arbitrary and Capricious

Nucor and Plaintiff-Intervenors argue that Commerce's determination that electricity was not provided by the GOK at LTAR is arbitrary and capricious because Commerce failed to consider the manner in which the pricing system fails to accurately reflect the underlying costs of energy generated by certain types of electricity producers. <u>See</u> Pl. & Pl.-Intervenors' Br. at 24–29.[18]  Defendant responds that Commerce considered all relevant costs in evaluating the adequacy of remuneration, including, the prices KEPCO paid for electricity to the KPX.  Def.'s Resp. Br. at 26.

In the final determination, when addressing cost recovery, Commerce explained that it chose to focus on the prices KEPCO paid for electricity on the KPX, rather than on the costs of the electricity generators, because KEPCO develops its industrial tariff

---

[18] Specifically, Nucor and Plaintiff-Intervenors contend that the KPX pricing mechanism inadequately compensates electricity generators with higher fixed costs. Pl. & Pl.-Intervenors' Br. at 25–27.  They argue that the component of the pricing mechanism that compensates producers for fixed costs of generating electricity provides a uniform fixed compensation that systematically undercompensates higher fixed-cost generators, like KEPCO's nuclear generation subsidiaries. <u>Id.</u> at 25–26.

schedule based upon the purchase price of electricity on the KPX.[19]  Final Decision Memo

at 23.  Nucor and Plaintiff-Intervenors, however, claim that KEPCOs prices do not reflect

the prices the KPX actually pays.[20]  <u>See</u> Pl. & Pl.-Intervenors' Br. at 26 (arguing that "[t]he

KPX electricity price that KEPCO pays, and on which it bases its cost accounting, thus

systematically understates generation costs and undercompensates high-fixed-cost

generators like nuclear generators."); <u>id.</u> at 24–26, 28–29.  Nothing in the statute requires

Commerce to consider how the authority acquired the good or service that was later

provided to respondents.

Commerce justified its decision not to request information on the costs of the

generators, including the nuclear generators,

> because the costs of electricity to KEPCO [(i.e., the relevant authority)] are
> determined by the KPX.  Electricity generators sell electricity to the KPX,
> and KEPCO purchases the electricity it distributes to its customers through
> the KPX.  Thus, the costs for electricity are based upon the purchase price

---

[19] Commerce may find that a benefit was conferred when an authority provides goods or services at less than adequate remuneration.  <u>See</u> 19 U.S.C. § 1677(5).  An authority is defined as "a government of a country or any public entity within the territory of the country."   19 U.S.C. § 1677(5)(B).  Commerce found KEPCO was an "authority" pursuant to 19 U.S.C. § 1677(5)(B). <u>See</u> Prelim. Decision Memo at 18–19; 19 U.S.C. § 1677(5)(B).

[20] Commerce recounts that

> Petitioners also argue that electricity tariffs do not include the full cost of
> generation, including electricity from nuclear generators, because steel producers
> purchase electricity predominantly during off-hours where electricity is primarily
> generated from nuclear generation units.  However, Petitioners have failed to
> provide any evidence that the prevailing market conditions for the provision of
> electricity in Korea are that utility companies have separate tariff rates that are
> differentiated based upon the manner in which the electricity is generated.  The
> tariff schedule on the record of our investigation does not support this proposition.
> Petitioners have also failed to adequately support a claim that KEPCO's costs of
> electricity used in developing its tariff schedule do not fully reflect its actual costs
> of the electricity that it transmits and distributes to its customers in Korea.

Final Decision Memo at 23.

of electricity from the KPX, and this is the cost that is relevant for KEPCO's industrial tariff schedule.

Final Decision Memo at 23 (citation omitted).  Where, as here, Nucor and Plaintiff-

Intervenors' allegation is that electricity is provided by KEPCO to respondent CORE

producers at LTAR, see Pl. & Pl.-Intervenors' Br. at 24–25, it is reasonable for Commerce

to focus its inquiry on the price charged by KEPCO to the respondent producers, and not

on the price KEPCO pays the KPX.[21]  See Final Decision Memo at 18–19, 23; Prelim.

Decision Memo at 18.

---

[21] Similarly, Nucor and Plaintiff-Intervenors object to Commerce's finding that petitioners below failed to demonstrate that the costs KEPCO uses to develop its tariff schedule fully reflect KEPCO's costs for electricity.  Pl. & Pl.-Intervenors' Br. at 28–29; Final Decision Memo at 23. Nucor and Plaintiff-Intervenors argue that in their brief to the agency below, they provided sufficient evidence to demonstrate,

> (i) KPX pays the same "capacity price" [(i.e., the fixed cost of generating electricity, as in the costs of building and maintaining the generators)] to all generators to compensate for fixed costs, regardless of actual fixed costs, (ii) the fixed costs of nuclear generators are substantially higher than the fixed costs of other generators, and (iii) the GOK justifies lower industrial electricity prices because nuclear generators supply more electricity during the hours when industrial users consume larger amounts of electricity.

Pl. & Pl.-Intervenors' Br. at 28 (citing Case Brief of the Nucor Corporation at 26–30, PD 502, bar code 3459696-01 (Apr. 14, 2016) ("Nucor Agency Br."); see also GOK [Response to Questionnaire] Exhibit E-3 (KEPCO Form 20-F SEC April 30, 2015 (ENG)) at 31, PD 203, bar code 3305223-07 (Sept. 14, 2015) (providing KEPCO's explanation of the pricing factors in the pricing of electricity in the Korean market).  Nucor and Plaintiff-Intervenors' argument focuses on the electricity generators' costs and whether the generators' costs are recouped, instead of addressing whether KEPCO's costs (i.e., the price KEPCO pays for electricity on the KPX) are recouped through electricity sales. See Pl. & Pl.-Intervenors' Br. at 25–29; see also Nucor Agency Br. at 25–30.  Nucor and Plaintiff-Intervenors' arguments address the sufficiency of the prices paid by KEPCO to electricity generators on the KPX, and not whether the prices paid by the respondents represent adequate remuneration to KEPCO.  It is the latter, and not the former that Commerce reasonably determined is the relevant "authority" for purposes of the LTAR inquiry. Prelim. Decision Memo at 18–19.

**PUBLIC VERSION**

Nucor and Plaintiff-Intervenors argue that Commerce arbitrarily disregarded the prices paid by KEPCO to the KPX for electricity because "the KPX is wholly owned by KEPCO and its generating subsidiaries," and is therefore part of the relevant authority for purposes of Commerce's LTAR analysis.  Reply Br. Pl. Nucor Corp. & Pl.-Intervenors ArcelorMittal USA LLC, AK Steel Corp., & United States Steel Corp. at 12, July 24, 2017, ECF No. 70 ("Reply Br.") (citing GOK [Response to Questionnaire] Exhibit E-3 (KEPCO Form 20-F SEC April 30, 2015 (ENG)) at 31, PD 203, bar code 3305223-07 (Sept. 14, 2015)).  Defendant's counsel argued that Nucor and Plaintiff-Intervenors failed to exhaust this argument below.  Oral Argument at 00:20:35–00:21:24, Oct. 20, 2027, ECF No. 81. Specifically, Defendant argued that Nucor and Plaintiff-Intervenors did not raise at the agency level the argument that, because the KPX was owned by KEPCO, the KPX should be considered part of the relevant authority.  Id.  If a party fails to exhaust available administrative remedies before the agency, "judicial review of Commerce's actions is inappropriate."  See Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003) (quoting Sharp Corp. v. United States, 837 F.2d 1058, 1062 (Fed. Cir. 1988)).  This Court has "generally take[n] a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases."  Corus Staal BV v. United States, 502 F. 3d 1370, 1379 (Fed. Cir. 2007) (citations omitted). Absent exceptional circumstances, see Hormel v. Helvering, 312 U.S. 552, 557 (1941), it would be inconsistent with the purposes of the exhaustion doctrine to require Commerce to explain a challenge to its findings that was not raised at the administrative level.  Nucor did not make this argument to Commerce; in its brief to the agency, Nucor simply

describes, in a parenthetical, the KPX as being "100% owned by KEPCO and its subsidiaries."  See Case Brief of the Nucor Corporation at 27, PD 502, bar code 3459696-01 (Apr. 14, 2016) ("Nucor Agency Br.").  Nucor did not argue at the agency level that, as a result of the corporate ownership structure, KPX should be treated as part of the relevant authority, i.e., as part of KEPCO.  Therefore, the court will not address this argument here.

### C. Commerce's Determination is Supported by Substantial Evidence

Nucor and Plaintiff-Intervenors claim that "Commerce's final determination that KEPCO's electricity prices are consistent with market principles is not supported by substantial evidence[.]"  Pl. & Pl.-Intervenors' Br. at 29.  Specifically, Nucor and Plaintiff-Intervenors claim that Commerce left unanswered record evidence demonstrating government intervention and subsidization in the electricity market and KEPCO's failure to recover costs.  See id. at 29–34.  For the reasons that follow, Commerce's determination is supported by substantial evidence.

Here, to determine that KEPCO's price-setting mechanism is consistent with market principles, Commerce reviewed the parameters used by KEPCO to determine electricity prices for consumers in the Korean market and the extent to which those pricing parameters allowed KEPCO to recoup its costs through electricity sales.  See Final Decision Memo at 18–21, 23.  In analyzing KEPCO under the tier three benchmark, Commerce examined KEPCO's price setting mechanism as a government price-setting philosophy.  Id. at 19–23.  Commerce relied upon "GOK's report[ing] that a single tariff rate table applied throughout the POI . . . and was applicable to the respondents in this

investigation." Id. at 18 (citing GOK [Response to Questionnaire] Exhibit E-13 (Electricity

Tariff Table (ENG)) at Ex. E-13, PD 210, bar code 3305223-17 (Sept. 14, 2015); GOK

Questionnaire Section II at 10; GOK Second Suppl. Questionnaire at 10).   Commerce

further found that there "is no information on the record that [respondents] are treated

differently from other industrial users of electricity that purchase comparable amounts of

electricity" from KEPCO.  Id. at 19.  Commerce found that the tariff schedule placed on

the record does not support the proposition that utility companies in Korea have separate

tariff rates that reflect different pricing based upon the manner in which the electricity is

generated.  Id. at 23.  In addition, Commerce analyzed electricity costs and explained that

KEPCO purchases electricity from the KPX, which it later distributes to its customers,

including the respondents.  Id. at 18–19, 23.  Commerce compared KEPCO's calculated

costs (i.e., the prices paid on the KPX according to the methodology provided by the

GOK) to the industry tariff applicable to respondents, and determined that "KEPCO more

than fully covered its cost for the industry tariff applicable to [the] respondents."   Final

Decision Memo at 23 (citing GOK Second Suppl. Questionnaire at 11).   Nucor and

Plaintiff-Intervenors do not point to any problems with KEPCO's calculations of its costs,

nor do they argue that KEPCO's costs, based upon what KEPCO paid to the KPX during

the POI, were higher than the prices placed on the record in KEPCO's tariff schedule.

Therefore, Commerce's determination that KEPCO's electricity prices are consistent with

market principles is supported by substantial evidence.

        Nucor and Plaintiff-Intervenors allege that documents and statements from third

parties, including those from the United States government and the GOK, all support the

conclusion "that KEPCO uses subsidized electricity prices to support industrial competitiveness."  Pl. & Pl.-Intervenors' Br. at 30; see also Petitioners' Petition Part 5 at Ex. V-9, PD 3, bar code 3280986-05 (June 3, 2015) (reproducing a copy of a paper titled "Electricity in Korea," presented to a Symposium on APEC's New Strategy for Structural Reform); Petitioners' Petition Part 6 at Exs. V-11, V-15, PD 9, bar code 3280986-06 (June 3, 2015) (reproducing copies of two news articles);[22] Petitioners' Petition Part 4 at Ex. V-2, PD 2, bar code 3280986-04 (June 3, 2015) ("Petition, Part 4") (reproducing a copy of a report published by the U.S. Energy Information Administration).   However, it is reasonably discernable that Commerce considered these sources and simply found them irrelevant to KEPCO's cost recovery.[23]   Final Decision Memo at 23 (discussing the relevancy of the price paid to KEPCO).  A review of these sources reveals that they do not speak specifically to whether KEPCO's electricity tariff pricing system, as applied across various electricity consumer classifications, allows KEPCO to recover its costs.[24]

---

[22] Although the full content of Ex. V-11 appears in the citation provided, the cover page identifying the exhibit as "Exhibit V-11" appears in Petitioners' Petition Part 5, PD 3, bar code 328-0986-05 (June 3, 2015).

[23] In addressing the National Assembly Report which does specifically speak to KEPCO's ability to recover its costs, Commerce explained that the methodology used to produce the data in the National Assembly report, (i.e., comparing company-specific revenue to aggregated cost) was flawed, predated the POI, and was therefore unpersuasive.  See Final Decision Memo at 23–24; see also Petitioners' Petition Part 7 at Ex. E-4, CD 10, bar code 3280961-07 (June 3, 2015) (reproducing a copy of the 2013 National Assembly Report (English and Korean translations)).

[24] Specifically, Nucor and Plaintiff-Intervenors state that Commerce, in Korean Welded Line Pipe IDM, "acknowledged 'cross-subsidization' in the Korean electricity market and found that 'cheap power significantly helped the export-led growth of the Korean economy, while nurturing an industry structure which consumes too much power and which cannot survive with a price that would recover costs.'"  Pl. & Pl.-Intervenors' Br. at 30 (quoting [CVD] Investigation of Welded Line

(footnote continued)

Nucor and Plaintiff-Intervenors also argue that record evidence, demonstrating that the GOK intervened to suppress tariff increases for political reasons, undermines Commerce's conclusion that electricity prices are set consistently with market principles. Pl. & Pl.-Intervenors' Br. at 31–33.  However, it is reasonably discernible that Commerce believes its methodology accounts for the political dynamic within Korea.  Commerce's methodology for assessing the extent to which a government authority prices a good or service consistently with market-principles (i.e., a tiered benchmark analysis) includes assessing the government's price-setting philosophy, costs, or price discrimination.  See CVD Preamble, 63 Fed. Reg. at 65,378; 19 C.F.R. § 351.511(a)(2)(iii).  A tier three benchmark anticipates situations where the government intervenes, such that it is the only source available to consumers in that country.  See CVD Preamble, 63 Fed. Reg. at 65,378.  Commerce recognized that government intervention alone is not a basis for determining that a government price is inconsistent with market principles.  See id. (recognizing that under a tier three benchmark analysis there may be a situation "[w]here

---

Pipe from the Republic of Korea: Issues and Decision Memorandum for the Final Negative Determination at 14, C-580-877, (Oct. 5, 2015), available at http://ia.ita.doc.gov/frn/summary/korea-south/2015-25967-1.pdf (last visited Feb. 1, 2018) ("Korean Welded Line Pipe IDM")).  However, the language Nucor and Plaintiff-Intervenors quote is not specific to whether KEPCO recovered its costs.  In fact, in Korean Welded Line Pipe IDM, Commerce was able to "verif[y] that the electricity tariff for KEPCO is developed based upon the utility company's [own] annual cost data" because KEPCO uses "an independent accounting firm to audit its cost and calculate the annual cost of electricity." Id. at 17.  Commerce made this finding although there was record evidence showing the GOK's intervention in the electricity market.  Id. at 14.  Nucor and Plaintiff-Intervenors also cite a U.S. Energy Information Administration report, which they claim "conclude[s] that KEPCO's electricity tariff pricing system . . . historically has not reflected the true costs of [electricity] generation and distribution[.]" Pl. & Pl.-Intervenors' Br. at 30 (quoting Petition, Part 4 at Ex. V-2).  This proposition, likewise, fails because it is not addressing whether KEPCO is able to recover its own costs.

the government is the sole provider of a good . . . [and explaining that, nevertheless, Commerce may still] assess whether the government price was set in accordance with market principles").

Nucor and Plaintiff-Intervenors also argue that Commerce's determination that KEPCO's price-setting mechanism permitted KEPCO to recover its costs is unsupported by substantial evidence.  Pl. & Pl.-Intervenors' Br. at 29–30, 33–34.  Nucor and Plaintiff-Intervenors present alternative calculations that they purport undermine the agency's reliance on data from the GOK.[25]  Id. at 33–34; Nucor Agency Br. at 26–31.  Commerce adequately explained why the alternative calculations did not detract from its determination that KEPCO's price-setting mechanism reflects market principles by identifying two flaws in Nucor and the Plaintiff-Intervenors' cited data.  Final Decision Memo at 23–24.  First, Commerce found the methodology used to produce the data Nucor and Plaintiff-Intervenors used for their alternative calculations compares company-specific revenue to aggregated cost.  Id. at 24.  Second, Commerce noted that the data predated the POI by two years and that KEPCO had increased industrial tariffs on three separate occasions since then.  See id.  It is apparent that Commerce weighed the evidence, and the court declines to reweigh it.

---

[25] Specifically, Nucor and Plaintiff-Intervenors claim that their calculation taking [[

]], Pl.

& Pl.-Intervenors' Br. at 34 (citing Nucor Agency Br. at 31), demonstrates that [[
]].  Id. at 33–34.

### II. Commerce's Determination Not to Apply AFA

Nucor and Plaintiff-Intervenors challenge, as an abuse of discretion, arbitrary, and unsupported by the record, Commerce's decision not to apply AFA to infer that state intervention by the GOK resulted in electricity prices that are inconsistent with market principles.   Pl. & Pl.-Intervenors' Br. at 34–39.   Defendant argues that Commerce's determination was reasonable because the GOK did not withhold information requested of it, provide unverifiable information, or fail to meet deadlines or impede the proceeding. Def.'s Resp. Br. at 28–33.  For the reasons that follow, Commerce's decision not to apply AFA is reasonable in light of the record.

As already discussed, a benefit may be conferred "in the case where goods or services are provided, if such goods or services are provided for [LTAR][.]"  19 U.S.C. § 1677(5)(E)(iv).   As already discussed, Commerce has ample deference to select a methodology for determining whether a good or service is provided at LTAR.  See Fujitsu, 88 F.3d at 1039; Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 927 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4241. Pursuant to 19 U.S.C. § 1677e(a), Commerce shall generally apply facts otherwise available if: (1) information necessary to Commerce's administrative determination is not available on the record; (2) an interested party withholds information requested or fails to provide the information in a timely fashion or in the form and manner requested; (3) significantly impedes a proceeding; or (4) provides the information requested, but the information cannot be verified.  19 U.S.C. § 1677e(a).  Furthermore, if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to

comply with a request for information," the statute permits Commerce to "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available[.]"  19 U.S.C. § 1677e(b)(1)(A).

Here, Commerce determined that applying AFA is unwarranted because the GOK submitted timely and complete responses to all of Commerce's questionnaires.  See Final Decision Memo at 12–13.  Specifically, the GOK provided complete and extensive responses with respect to "KEPCO's rate setting methodology, cost recovery rates, investment return, and profit information."  See id. at 13.  Moreover, it "provided usage data on all electricity users, including the top 100 industrial users of electricity[,]" and "adequate translations of the large and complicated [record] documents[.]"  Id.  At verification, Commerce was able to verify KEPCO's standard pricing mechanism, and "its application in the setting of electricity tariffs."  Id.

Nucor and Plaintiff-Intervenors argue that Commerce's decision not to apply AFA is arbitrary because Commerce regularly applies adverse inferences in similar circumstances.  Pl. & Pl.-Intervenors' Br. at 36 (citing Issues and Decision Memorandum for the Final Determination in the [CVD] Investigation of High Pressure Steel Cylinders from the People's Republic of China [("PRC")] at 9, C-570-978, (Apr. 30, 2012), available at  http://ia.ita.doc.gov/frn/summary/prc/2012-10954-1.pdf (last visited Feb. 1, 2018) ("High Pressure Steel Cylinders IDM"); Issues and Decision Memorandum for the Final Determination in the [CVD] Investigation of Narrow Woven Ribbons with Woven Selvedge from the [PRC] at 17, C-570-953, (July 12, 2010), available at http://ia.ita.doc.gov/frn/summary/prc/2010-17541-1.pdf (last visited Feb. 1, 2018)

("Narrow Ribbons with Woven Selvedge IDM"); Issues and Decision Memorandum for the

Final Affirmative [CVD] Determination: Laminated Woven Sacks from the [PRC] at 81–

82, C-570-917, (June 16, 2008), available at http://ia.ita.doc.gov/frn/summary/prc/E8-

14256-1.pdf (last visited Feb. 1, 2018) ("Laminated Woven Sacks IDM")); see id. at 36–

39.  However, unlike in the determinations cited by Nucor and Plaintiff-Intervenors, here,

Commerce determined that the GOK complied with Commerce's requests for information

and that all the information provided was verifiable.[26]  See Final Decision Memo at 13.  In

addition, Nucor and Plaintiff-Intervenors point to deficiencies in the GOK's responses,

which they argue detract from the reasonableness of Commerce's determination that the

_____

[26] All the determinations cited by Nucor and Plaintiff-Intervenors can be distinguished.  In High Pressure Steel Cylinders IDM, Commerce applied AFA because the Chinese government failed to respond to Commerce's request for particular records that were necessary to verify information provided by other Chinese government agencies.  See High Pressure Steel Cylinders IDM at 9–10.  Commerce declined to entertain the Chinese government's proffered explanation that the records could not be produced because they were maintained by a separate government agency.  Id. at 9.  Further, the Chinese government would not provide the alternative comparable information requested by Commerce, explaining that they did not consider it relevant.  Id. at 9–10.  Therefore, Commerce could not verify the original documents, and applied AFA.  Id. at 10.

In Narrow Ribbons with Woven Selvedge IDM, Commerce identified specific documents and requested the Chinese government produce them.  See Narrow Ribbons with Woven Selvedge IDM at 17.  The Chinese government refused to provide the identified documents, claiming they did not "routinely maintain such information."  Id.  Commerce provided an alternative way for the Chinese government to satisfy the request, however, again, the Chinese government refused, stating that the firms were not required to provide the information sought, and that it too would not provide the information.  See id.  Therefore, Commerce applied AFA, because nothing in the record substantiated an inference that the Chinese government attempted to review the requested documents or reproduce them in some alternate form.  See id.

In Laminated Woven Sacks IDM, Commerce applied AFA because although some documents were produced, verification of the documents would have been futile, as other information necessary for verification was within the control of the Chinese government and was not provided.  See Laminated Woven Sacks IDM at 81.  Commerce determined that the information withheld was highly relevant for Commerce to conduct its investigation, and that by withholding the information, the Chinese government was impeding Commerce's investigation.  See id. at 81–82.

GOK responded fully and completely. Pl. & Pl.-Intervenors' Br. at 37–39. Specifically, Nucor and Plaintiff-Intervenors highlight the GOK's failure to provide sufficient information regarding informal consultations between KEPCO and other government bodies, claiming these consultations would reveal KEPCO's inability to raise electricity tariffs in a commercially meaningful way. See Pl. & Pl.-Intervenors' Br. at 37–38; GOK Questionnaire Section II at 22. However, Commerce determined that it was able to fully analyze and "verify KEPCO's standard pricing mechanism and its application in the setting of industrial electricity tariffs." Final Decision Memo at 13. As explained above, the relevant data for assessing adequacy of remuneration is the cost at which KEPCO purchased electricity from the KPX. Id. at 23. It is reasonably discernible that Commerce concluded that the informal consultations were not relevant to determining whether the prices in KEPCO's industrial tariff schedule were set in accordance with market principles. Commerce sufficiently explained that it had adequate information on the record to determine that: KEPCO recovered its costs in sales to electricity consumers; KEPCO's tariffs were the same for all industrial consumers using similar quantities of electricity during the POI; and KEPCO applied a uniform price-setting philosophy throughout the POI. See id. at 13, 20, 23. Here, Commerce adhered to its methodology and supported its determination. Therefore, Commerce's decision not to apply AFA was reasonable.

## CONCLUSION

For the reasons discussed, Commerce's <u>Final Results</u> are in accordance with law and supported by substantial evidence.   Therefore, the <u>Final Results</u> are sustained. Judgment will enter accordingly.


    <u>/s/ Claire R. Kelly</u>
    Claire R. Kelly, Judge


Dated: February 6, 2018
    New York, New York